# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 53110-1-II |
| Respondent, | |
| v. | |
| FIYORI BERHE BAHTA, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — A jury convicted Fiyori Bahta for five counts of theft from a vulnerable adult in varying degrees, theft in the third degree, and two counts of trafficking in stolen property in the first degree. The crimes related to jewelry stolen from an assisted living facility where Bahta worked.

Bahta argues that insufficient evidence supports all six of her theft convictions because the State never proved she was the person who committed the crimes. Bahta contends that the State only proved that she had access to the jewelry, but no one testified that they saw her with any stolen property while on the assisted living facility's premises. Bahta also challenges the sufficiency of one of her theft from a vulnerable adult in the first degree convictions, arguing that insufficient evidence supports the jury's finding that the stolen ring had a market value in excess of $5,000.

In a statement of additional grounds for review (SAG), Bahta asserts that she received ineffective assistance of counsel at sentencing and that the court erred by not giving her a first-time offender waiver.

We affirm Bahta's convictions and sentence.

FACTS

On October 10, 2017, Bahta began working as a licensed practical nurse in the memory care unit of the Weatherly Inn, an assisted living facility. The memory care unit provided support for residents who suffered from dementia. Residents in the memory care unit often could not remember the names of their family members. Many needed assistance to do normal, everyday tasks.

A few weeks after Bahta started working, staff at the Weatherly Inn began receiving reports that residents were missing rings and other jewelry. Between October 19 and 28, staff learned that DG and other residents[1] were missing rings they owned.

During that same time, Victoria Infante, a nurse at the facility, also reported missing a watch and rings. Before her shift, Infante had taken off her rings and watch and put them inside her purse, as was her standard practice. Bahta was the only other person present. At the end of her shift, Infante discovered her purse did not contain the rings and watch.

On October 28, the Weatherly Inn nursing director, Theresa Edwards, notified staff about the disappearances and implemented a policy where staff checked the residents for rings at the end of each shift and noted in their charts whether they had their rings. If staff noticed that a resident's ring was missing, they were to notify Edwards immediately.

---

[1] Because the State either did not charge Bahta for theft as to the other residents' property or because the jury found Bahta not guilty, many of facts related to those individuals and their property are not discussed further.

Even after the enactment of the policy, rings continued disappearing. On November 7, staff notified Edwards that rings belonging to BB, MLB, and RM had disappeared.

Edwards's concern led her to interview staff and investigate staff schedules.[2] Edwards determined that Bahta was "the common denominator." 3 Report of Proceedings (RP) at 326. She alone, among the staff, worked shifts on every day that residents' jewelry disappeared. When questioned about Edwards's determination, Bahta denied stealing the jewelry.

Edwards then contacted the police and conveyed to them what she had discovered. Detective Scott Yenne searched an online database and discovered that Bahta had recently sold items to Gold Masters Precious Metals.

Yenne learned that Bahta had sold six rings and a small gold chain on October 23 for $550. Then, on November 7, she had sold six more rings for $1,750.

According to the owner of Gold Masters, he typically pays jewelry sellers for the gold but not for any stones because he cannot verify their authenticity while they are mounted. After assessing the current market value of the gold, he pays 60-90 percent of the estimated value.

Yenne obtained the items that Bahta had sold and, after speaking with residents' family members, confirmed that they belonged to Infante and the above-mentioned residents at the Weatherly Inn. Yenne also learned that Bahta had sold a ring to Gold Masters that belonged to another resident, FK.

---

[2] The Weatherly Inn did not have surveillance cameras in the residents' rooms because having them violated state regulations. Cameras were permitted in certain areas such as entrances, exits, and elevators. WAC 388-78A-2680.

Nobody reported any missing jewelry after November 8, when Bahta stopped working at the Weatherly Inn.

The State charged Bahta with two counts of theft from a vulnerable adult in the first degree, three counts of theft from a vulnerable adult in the second degree, and two counts of theft in the third degree. Bahta pled not guilty, and the case proceeded to trial.

At trial, GJ, RM's daughter, testified as to the value of RM's ring. During her testimony, the following exchange occurred:

> [State:] And are you familiar with the approximate value of [RM's] ring?
> [GJ:] I'm not familiar with the—I don't know how much it cost. I would—could guess how much it would cost.
> [State:] Okay. Are you familiar with jewelry at all?
> [GJ:] Yes.
> [State:] Okay. And would you estimate that the value of that ring—
> [GJ:] I would estimate that that's about $10,000.
> [State:] Would you estimate it's above $5,000?
> [GJ:] Pardon me?
> [State:] Is it above $5,000?
> [GJ:] I would think it would be.
> . . . .
> [State:] Are you familiar with the ring?
> [GJ:] Yes.
> [State:] Are you aware whether or not the diamonds are real or cubic zirconium?
> [GJ:] I am—I don't know for sure. I mean, I would—I would think that they would be real, but I've never taken it to a jeweler, so—Yes, I would believe they would be real.

4 RP at 366-67. GJ testified that she owned diamond rings and was familiar with the value of her own rings. The court admitted photographs of RM's ring.

Nurses at the Weatherly Inn saw Bahta alone with residents around the time that they lost their rings. Specifically, on November 6, one nurse called Bahta to MLB's room to address a wound, and before he left, he noted that MLB had her ring on. The next day, the ring was reported missing.

4

Bahta admitted that she sold the jewelry to Gold Masters. However, she denied taking the jewelry from the residents. Instead, Bahta testified that another nurse, CT, had given her the rings and asked her to sell them for her because she did not have photo identification and therefore could not sell them herself. Bahta said she did not know that the jewelry was stolen because CT had said she owned the jewelry. Bahta also testified that she did not know that more than one ring had been stolen from the Weatherly Inn; therefore, she did not connect CT's jewelry with that from the home.

The court instructed the jury. Regarding all the theft counts, the court instructed the jury that "'[t]heft' means to wrongfully obtain or exert unauthorized control over the property or services of another, or the value thereof, with intent to deprive that person of such property or services." Clerk's Papers (CP) at 42; *see* CP at 49-50, 52-54, 56-57.

Regarding Bahta's theft from a vulnerable adult in the first degree counts, the court instructed the jury that the property at issue must exceed $5,000 in value. The court further instructed that "[v]alue means the market value of the property at the time and in the approximate area of the act. Market value is the price that a well-informed buyer would pay to a well-informed seller, when neither is obligated to enter the transaction." CP at 43.

The jury found Bahta guilty of two counts of theft from a vulnerable adult in the first degree, three counts of theft from a vulnerable adult in the second degree, and one count of theft in the third degree. The jury also found Bahta guilty of two counts of trafficking in stolen property in the first degree.

The State recommended a standard range sentence of 61 months. Bahta's lawyer asked the court to consider a first-time offender waiver and also asked the court to consider mitigating circumstances under RCW 9.94A.535(1)(g). Lastly, Bahta's lawyer recommended a drug offender sentencing alternative (DOSA).

The court stated that, given the nature of Bahta's crimes, it was "not the type of case that [it thought] deserving of a first time offender or a DOSA." 7 RP at 770. The court then sentenced Bahta to 46 months of confinement, the low end of the standard range. Bahta appeals.

## ANALYSIS

Bahta argues that insufficient evidence supports her theft convictions. She contends that "[t]he State's evidence did not show beyond a reasonable doubt that [she] was the person who committed the theft offenses." Br. of Appellant at 10. If this court disagrees, then Bahta challenges count II, the theft of RM's ring, arguing insufficient evidence exists that the market value of RM's ring exceeded $5,000. We reject both of Bahta's arguments.

I.    LEGAL PRINCIPLES

To determine whether sufficient evidence supports a conviction, we view the evidence in the light most favorable to the State and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt. *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). "In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it." *State v. Drum*, 168 Wn.2d 23, 35, 225 P.3d 237 (2010). Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). "[I]nferences based

on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013). We defer to the jury to resolve issues of conflicting testimony, credibility of witnesses, and persuasiveness of the evidence. *State v. Rodriquez*, 187 Wn. App. 922, 930, 352 P.3d 200 (2015).

II. IDENTITY

By finding Bahta guilty of six counts of theft, the jury found that she wrongfully obtained or exerted unauthorized control over six other people's property or services with the intent to deprive those people of such property or services.

The evidence showed that Bahta had the opportunity to steal the jewelry, and that she admitted to possessing the jewelry and selling it to Gold Masters. Additional evidence supports that Bahta, and nobody else, wrongfully obtained Infante's and the residents' jewelry.

First, the timing supports that Bahta stole the residents' property because Bahta had only worked a few weeks at the Weatherly Inn before the reports of disappearances began. Second, only Bahta's shift schedule aligned with all of the disappearances. Third, after Bahta stopped working at the Weatherly Inn, nobody reported any missing rings.

Furthermore, Infante provided corroborating evidence. Bahta was the only nurse present when she took off her jewelry before her shift. After her shift, her jewelry was gone. Bahta sold Infante's jewelry to Gold Masters.

Bahta claims, however, that insufficient evidence supports her conviction because no one testified that they actually witnessed her take any jewelry or saw her with any of the stolen jewelry on the Weatherly Inn's premises. However, a jury may give equal weight to direct and circumstantial evidence. Direct evidence is not necessary to sustain a conviction. Therefore, we conclude that sufficient evidence supports Bahta's convictions.

III.    VALUE

Market value is an objective standard that consists of the price which a well-informed buyer would pay to a well-informed seller, when neither is obligated to enter the sales transaction. *State v. Longshore*, 141 Wn.2d 414, 429, 5 P.3d 1256 (2000). Value need not be proven by direct evidence. *State v. Hermann*, 138 Wn. App. 596, 602, 158 P.3d 96 (2007). Rather, the jury may draw reasonable inferences from the evidence. *State v. Melrose*, 2 Wn. App. 824, 831, 470 P.2d 552 (1970).

In *State v. Hammond*, 6 Wn. App. 459, 460, 493 P.2d 1249 (1972), the jury convicted the defendant of grand larceny, an element of which was that the stolen items had a combined value in excess of $75. On appeal, the defendant argued that certain evidence was erroneously admitted at trial and that insufficient evidence supported that the stolen items had a value of $75. *Hammond*, 6 Wn. App. at 460-61. At trial, the following exchange took place:

> Q (By the prosecutor) Now, again, I understand that you are not trying to sell the rings, but do you have an idea as to the approximate fair market value of them?
> A (By the owner-witness) Well, I am well satisfied that you couldn't buy a ring like this—
> (Defense counsel) I object.
> THE COURT: She may answer.
> Q (By the prosecutor) Go ahead, Mrs.—
> A (By the owner-witness) For $600, I know.

*Hammond*, 6 Wn. App. at 460.

The court concluded that sufficient evidence supported that the stolen items exceeded $75. *Hammond*, 6 Wn. App. at 463. Critical to its decision was the fact that the owner's estimate of the value exceeded $75 by several hundred dollars. *Hammond*, 6 Wn. App. at 463.

Bahta relies on *State v. Williams*, 199 Wn. App. 99, 398 P.3d 1150 (2017), to support her argument. In *Williams*, the issue was whether sufficient evidence supported the jury's finding that stolen property had a market value of over $750, an element of the crime of stolen property in the second degree. 199 Wn. App. at 103-04.

At trial, the State asked the property owner whether he was "able to assess a value of an amount that all that property was worth at the time it was taken?" *Williams*, 199 Wn. App. at 103. The owner responded that he "could give a rough estimate." *Williams*, 199 Wn. App. at 103. The State then asked, "What value would you total your loss at being?" *Williams*, 199 Wn. App. at 103. He responded, "I would say roughly $800." *Williams*, 199 Wn. App. at 103.

The court concluded that this evidence was insufficient because the owner's "rough estimate . . . barely exceeded the $750 minimum." *Williams*, 199 Wn. App. at 107. In reaching its conclusion, the court distinguished *Hammond*. The court noted that "[i]n *Hammond*, the value of the goods well exceeded the $75 minimum." *Williams*, 199 Wn. App. at 107. Additionally, in *Hammond*, the "prosecutor asked the victim to disclose a 'fair market value,'" while in *Williams*, the prosecutor "only requested a 'value.'" *Williams*, 199 Wn. App. at 107 (quoting *Hammond*, 6 Wn. App. at 460). The court also noted that the victim "did not testify to the basis of his opinion of value," stating "[f]or all we know, he used the purchase price of the goods, the replacement cost of the goods, or some intrinsic value to himself." *Williams*, 199 Wn. App. at 111.

Here, the State asked GJ to estimate the value of RM's ring. Therefore, the State's question here more closely resembled the question in *Williams* because it similarly did not ask the witness to state the "fair market value." Additionally, like in *Williams*, GJ did not testify what formed the basis of her determination of value. She did not state whether she based her assessment of value on the purchase price, the replacement cost, or some intrinsic value.

9

Nonetheless, we conclude that this case is more analogous to *Hammond* than *Williams*. GJ estimated that the value of the ring was approximately $10,000. GJ also said that she believed the diamonds were real and that she was familiar with the value of diamond rings.

Bahta admits the truth of the State's evidence and all reasonable inferences therefrom. We conclude that the State presented sufficient evidence from which a reasonable juror could infer that the value of the ring exceeded $5,000.

## SAG ANALYSIS

### I. DOSA

Bahta asserts that she received ineffective assistance of counsel because her attorney "should have informed [her] of DOSA and also should have offered [DOSA] as a sentence." SAG at 1. We reject Bahta's claim because it is factually incorrect. At sentencing, her attorney did in fact recommend a DOSA.

### II. FIRST-TIME OFFENDER SENTENCE

Bahta asserts that she "was never offered the first time offender sentence and should have been offered [one] if [she] met the qualifications for it." SAG at 1.

The first-time offender waiver sentencing statute provides, in relevant part: "In sentencing a first-time offender the court may waive the imposition of a sentence within the standard sentence range." RCW 9.94A.650(2). Therefore, the court had the discretion, but was not required, to waive Bahta's sentence under the statute. RCW 9.94A.650(2) does not delineate the factors a court may properly consider in exercising its discretion.

Here, the trial court considered, but chose not to grant, a first-time offender waiver. We conclude that the court did not err.

We affirm Bahta's convictions and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Lee, C.J.

_____
Glasgow, J.